UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

| | |
|---|---|
| SHIFTPIXY, INC., | : |
| Plaintiff, | : 22 Civ. _____ |
| | : COMPLAINT |
| - against - | : |
| | : JURY TRIAL DEMANDED |
| ACCESS2 FINANCIAL, INC., and GREGORY BERGMAN, | : |
| | : |
| Defendants. | : |
| | : |

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

Plaintiff ShiftPixy, Inc., by its attorneys identified below, for its complaint against defendants Access2 Financial, Inc. and Gregory Bergman, respectfully alleges:

**Jurisdiction**

1. The jurisdiction of this Court over the within action rests upon 28 U.S.C. §1332(a)(1), in that there is complete diversity of citizenship between plaintiff and defendants, and the amount in controversy, exclusive of interest or costs, exceeds the sum or value specified by 28 U.S.C. §1332(a), all as more fully appears below.

**Nature of the Action**

2. This is an action for breach of express and implied contract, for unjust enrichment, and for monies had and received. Plaintiff seeks to recover damages from defendants in the sum of Three Hundred Thousand Dollars ($300,000.00), together with attorneys' fees as applicable by contract and prejudgment interest as provided by New York law, based on defendant Access2 Financial, Inc.'s failure of performance of its express and implied contract with plaintiff, on defendants' unjust enrichment in demanding and receiving a specific

payment from plaintiff, and on money had and received. The action also seeks to impose liability on the individual defendant as an alter ego of the corporate defendant.

**Parties**

3. Plaintiff ShiftPixy, Inc. ("ShiftPixy"), is a corporation duly formed and existing under the laws of the State of Wyoming, and having its principal place of business in Miami, Florida.

4. Defendant Access2 Financial, Inc. ("Access2") is a corporation duly organized and existing under the laws of the State of Delaware, and having its principal place of business located at 54 Loverin Hill Road, Salisbury, New Hampshire 06328.

5. Defendant Gregory Bergman ("Bergman") is an individual residing in, and a citizen of, the State of New Hampshire, with an address at 54 Loverin Hill Road, Salisbury, New Hampshire 06328.

**FACTS COMMON TO ALL CLAIMS FOR RELIEF**

6. Plaintiff ShiftPixy is a specialized staffing and human capital management service provider. It supplies human resources, employment compliance, insurance and payroll administration, and operational employment services solutions for its client-employers, and shift work or "gig" opportunities for employees, offering effective and workable responses to demands for sizeable contingent part-time workforces.

7. ShiftPixy's shares are listed and traded on the NASDAQ stock market under the stock symbol PIXY. NASDAQ is a global electronic marketplace for buying and trading securities. It was the world's first electronic exchange. Most of the world's technology giants, including Apple and Facebook (now Meta), are listed on the NASDAQ. As such,

investor relations and raising awareness of the company in financial media are of critical importance to ShiftPixy's ability to sustain and to grow its business.

8. Defendant Bergman holds himself out as a consultant who claims to possess financial and public relations consulting expertise and valuable knowledge and experience in the areas of financial media and investor awareness. Bergman further holds himself out as able to implement marketing and market awareness programs designed to increase awareness and visibility of his clients in the investment community through digital media/marketing campaigns.

9. ShiftPixy and Bergman entered into an agreement, dated as of May 13, 2021 (the "Agreement"), for the provision by Bergman to ShiftPixy of consulting services. (A true copy of the Agreement is annexed hereto as Exhibit A.) Specifically, pursuant to Section I of the Agreement, Bergman agreed to provide the following services to ShiftPixy:

> Strategic investor awareness planning • Email and SMS Digital Marketing • Investor outreach via in house personal opt-in email data bases • Investor outreach via in house personal SMS text messaging data bases • Virtual investor kits; online information packages • E-mail alerts to opt-in subscriber base for news releases • Viral Marketing • Social Media Marketing • Direct Mail Marketing•

10. In Section I of the Agreement, Bergman also represented and agreed that his services would be prepared:

> in accordance with the United States Securities and Exchange Commission's (hereafter "SEC") rules and amendments, Oct 23, 2000, regarding 17 CFR Parts, 240, 243 and 249, (Selective Disclosure and Insider Trading), Regulation FD (Fair Disclosure) , 1065-1, I 065-2, NASD Rules 2250, 2420, 2710 and 2711, the Can Spam Act of 2003 and any amendments thereto and all other relevant SEC regulations. All media marketing will include appropriate disclaimers as required by federal and state securities and all other applicable laws, rules and regulations.

11. As an overview of the Agreement and the program benefits to ShiftPixy to be furnished thereunder, Bergman further represented and agreed in Section I of the Agreement that:

> We employ diverse resources and technology to reach an audience of potentially millions of investors (including brokers, financial advisors, research analysts, retail investors and fund managers). We utilize our proven experience in traditional investor relations with our unique and proprietary marketing technologies to develop sustained high ROI shareholder synergies for the short and long-term.

12. Bergman further represented and agreed in Section I of the Agreement as follows:

> During this program, we will bring ShiftPixy, Inc. to the awareness of both retail investors as well as stockbrokers/financial advisors, equity research analysts, and fund/portfolio managers. Employing diverse resources including hyper targeted online advertising platforms, digital media, and social awareness, we will use our proven experience in traditional financial media marketing as well as non-traditional marketing technologies and efforts to develop sustained high ROI shareholder synergies.

13. Section I of the Agreement also described additional aspects of the services Bergman would provide, and represented and agreed to provide such services, to ShiftPixy, identified as "Core Tech-Driven Components":

> The core component of our campaign is the hyper specific online advertising upstream and downstream advertising from targeted investor websites to capture interested and active investors- versus a single pay per-click ad channel- this captures traffic from 21 web sites (10 upstream, 10 downstream and the original target)- enabling us to target highly specific investors interested in emerging growth opportunities and who have followed our recommendations in the past.

14. Section I of the Agreement specified as well that Bergman would institute a direct mail campaign for ShiftPixy, as follows:

Direct Mail to Top Retail and Institutional Investors.  While the core of our program is our Advanced (sic), proprietary technology, which reinforces an echo chamber of active audience, attracting investors who seek out and buy stocks both long and short term based solely on our recommendations, we also have a traditional outreach program, a hard mail out to top hedge funds, investment banks, portfolio managers, and managing directors at top U.S., European and Asian institutions.

15. Finally, as to "performance expectations," Section I of the Agreement stated:

While the Consultant can make no representations regarding price appreciation, this greater visibility and exposure should serve to highlight ShiftPixy, Inc.'s unique growth story; typical results from our programs net a minimum of a 10X increase in trading volume.

16. In Section 6.2 of the Agreement, Bergman agreed to indemnify ShiftPixy for any loss, including reasonable attorneys' fees, incurred as a result of and/or due to any actions or inactions and/or misstatements by Bergman, and if applicable by his agents and /or employees, in connection with Bergman's performance of his obligations and/or rendering of services pursuant to the Agreement or otherwise.

17. In its Section 6.1, the Agreement contains a choice of law clause designating New York law as governing law, a venue clause providing that claims or controversies arising out of the Agreement are to be brought in the state or federal courts sitting in New York, and a consent to personal jurisdiction clause by which Bergman consented to the exercise by the New York state or federal courts of personal jurisdiction over him.

18. Bergman failed to provide the services he agreed to provide to ShiftPixy under the Agreement, and has accordingly breached the Agreement.  Specifically, Bergman (a) failed, upon information and belief, to prepare the materials specified above, and (b) failed to

deliver such materials to ShiftPixy.  In short, Bergman failed to carry out the specifics of the marketing and market awareness program that he promised he would effect and carry out.

19. Bergman's breach was material in that it rendered Bergman's performance unacceptable and provided neither value nor benefit to ShiftPixy.

20. Under Section 6.2 of the Agreement, ShiftPixy was entitled to determine in good faith that Bergman had committed a material breach of the Agreement, and to declare Bergman in default and terminate the Agreement.

21. ShiftPixy so determined in good faith, declared Bergman in default, and terminated the Agreement.

22. On July 7, 2021, while putatively performing the Agreement (but while he had in actuality rendered no material performance), Bergman issued an invoice to ShiftPixy in the amount of Three Hundred Thousand Dollars ($300,000) (the "Invoice") under cover of an email dated July 7, 2021.  (A true copy of the transmittal email and Invoice is attached hereto as Exhibit B.)  While Bergman had signed the Agreement in his individual capacity and was the obligor under the Agreement, for reasons best known only to himself, he issued the Invoice in the name of a Delaware entity, defendant Access2.  Bergman had formed Access2, or caused it to be formed, on May 20, 2021, days after the date and execution of the Agreement.

23. The transmittal email contains no explanation of what the Invoice is or for what services it was putatively issued.  The Invoice itself indicated that it was for "120 Day Media Placement / Consulting."  Under the heading "Scope of Work," the Invoice further promised:

> Access2 will implement a media program through its own resources including via third parties to increase awareness and visibility of ShiftPixy, Inc.  Media outreach will include but is not limited to the following:

      Email and SMS Digital Marketing
      Viral Marketing • Social Media Marketing
      Targeted investor databases / websites
      Traditional media (TV and newspaper) outreach and placement

24. Assuming that the "120 Day Media Placement/Consulting" charges were pursuant to the Agreement, ShiftPixy paid the invoice.

25. Following this payment, Bergman simply disappeared. ShiftPixy's consistent efforts to communicate with him were met by silence. He did not return texts, SMSs, or email. He did not respond to telephone and did not return voicemail.

26. By August 9, 2021, ShiftPixy's CEO had grown tired of chasing Bergman, realized that Bergman had done virtually nothing of what he had promised, and finally became convinced that Bergman was simply a con man and that Bergman had hoodwinked him and ShiftPixy. He demanded the return of all monies paid, confirming that demand via email or text the following day. Bergman finally responded, but only with misdirection. He did not repay any funds.

27. On August 24, 2021, ShiftPixy commenced an action in this Court against Bergman for breach of contract. The action was based only on the Agreement, and sought recovery of the consideration ShiftPixy had paid thereunder ($150,000) as well as other relief.

28. Neither Bergman nor Access2 ever provided the performances specified in the Invoice. Specifically, they did not provide Email and SMS Digital Marketing; they did not provide Viral Marketing or Social Media Marketing; they did not provide targeted investor databases / websites; and they did not provide traditional media (TV and newspaper) outreach and placement.

29. The Invoice constitutes a separate and independent contract from the Agreement. Although it is unclear whether Bergman or Access2 is the actual obligor, the

addition of Access2 to Bergman by means of the Invoice, renders the obligor different from solely Bergman as provided in the Agreement, and the promissory aspects of the Invoice, while similar and properly construed to have been made pursuant to the Agreement, are distinct.

30. Upon information and belief, Bergman formed Access2 for the purpose of issuing the Invoice and receiving the funds he demanded of ShiftPixy; Access2 had no active business at the time it and Bergman issued the Invoice; Bergman was the owner of 100% of the shares of defendant Access2, and the sole director and officer thereof; and Bergman so dominated and controlled Access2 as to make him its alter ego. Bergman used Access2 to commit a fraud or wrong against ShiftPixy, to ShiftPixy's economic detriment and loss.

**FIRST CLAIM FOR RELIEF**
**(Breach of Express and Implied Contract)**

31. Plaintiff repeats and realleges the foregoing paragraphs of this complaint as if fully restated here as paragraph "31" thereof.

32. As a result of the facts alleged above, an express contract between ShiftPixy, as obligee and promisee and defendants as obligors and promisors was created by the issuance of the Invoice and the payment made by ShiftPixy in satisfaction of the Invoice.

33. Alternatively or in addition, an implied contact arose as a result of the conduct of the parties.

34. Under that express or implied contract, ShiftPixy assumed the obligation to pay defendants the sum of Three Hundred Thousand Dollars ($300,00.00), and defendants assumed the obligation to perform as specified in the Invoice by "implement[ing] a media program . . . to increase awareness and visibility of ShiftPixy, Inc.," that would include "Email and SMS Digital Marketing," "Viral Marketing," "Social Media Marketing," "Targeted investor databases / websites," and "Traditional media (TV and newspaper) outreach and placement.

35. ShiftPixy fully performed any and all obligations assumed under such contracts.

36. Defendants failed to perform as promised by means of the Invoice and otherwise to the detriment and damage of ShiftPixy.

37. By reason of the foregoing, defendants breached the aforesaid contracts and are liable to plaintiff for such breach for damages in the sum of Three Hundred Thousand Dollars ($300,000.00), or such other or further sum as the trier of fact may determine to be due and payable. Plaintiff is additionally entitled to recover its attorneys' fees and costs incurred in connection with this action.

## SECOND CLAIM FOR RELIEF
### (Unjust Enrichment)

38. Plaintiff repeats and realleges the foregoing paragraphs of this complaint as if fully restated here as paragraph "38" thereof.

39. By reason of the foregoing, defendants were enriched by securing monies from plaintiff putatively for the purpose of making paid media placements and providing consulting services but instead neither made paid media placements nor provided any consulting services.

40. This enrichment was at plaintiff's expense.

41. Equity and good conscience militate against permitting defendants to retain such enrichment.

42. Plaintiff is accordingly entitled to recover from defendants the value of such enrichment in the amount of Three Hundred Thousand Dollars ($300,000.00), or such other or further sum as the trier of fact may determine to be due and payable. Plaintiff is additionally entitled to recover its attorneys' fees and costs incurred in connection with this action

## THIRD CLAIM FOR RELIEF
### (Monies Had and Received)

43. Plaintiff repeats and realleges the foregoing paragraphs of this complaint as if fully restated here as paragraph "43" thereof.

44. Defendants received money belonging to plaintiff, defendants benefitted from receipt of the money, and under principles of equity and good conscience, defendants should not be permitted to keep the money

45. Plaintiff is accordingly entitled to recover from defendants the amount of Three Hundred Thousand Dollars ($300,000.00), or such other or further sum as the trier of fact may determine to be due and payable.

WHEREFORE, plaintiff ShiftPixy demands judgment against defendants in the sum of Three Hundred Thousand Dollars ($300,000.00), or in such other or different sum as may be proven herein, together with reasonable attorneys' fees as applicable, appropriate pre-judgment interest, and appropriate costs.

Dated: Cornwall-on-Hudson, New York
July 5, 2022

KARLINSKY LLC

By: /s/ Martin E. Karlinsky
Martin E. Karlinsky, Esq.
Bonnie H. Walker, Esq.
103 Mountain Road
Cornwall-on-Hudson, New York 12520
(646) 437-1430
martin.karlinsky@karlinskyllc.com
bonnie.walker@karlinskyllc.com

*Attorneys for Plaintiff ShiftPixy, Inc.*